United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MONSTER CONTENT, LLC,

    Plaintiff,

  v.

HOMES.COM, INC.,

    Defendant.

No. C 04-0570 FMS

**ORDER DENYING HOMES.COM, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

INTRODUCTION

This action concerns a dispute over a licensing agreement between plaintiff Monster Content, LLC ("Monster Content") and defendant HOMES.COM, INC. ("Homes"). Monster Content alleges that Homes breached its licensing agreement with Monster Content by providing its customers with direct access to a product that it was not licensed to provide. Homes and Monster Content seek a ruling by this Court as to whether the relevant provision of the licensing agreement is ambiguous as a matter of law. After reviewing the papers and the relevant authority, the Court DENIES Homes's motion for partial summary judgment that the licensing agreement is ambiguous.

\\\

# BACKGROUND

The factual background to this action is recited in this Court's order of January 7, 2005 on a prior Motion for Partial Summary Judgment (the "Court's January Order"). In relevant part, the background is as follows. Monster Content is the successor, by a series of asset purchases, to the assets of two predecessor owners, MonsterDaata, Inc. ("MDI") and Fishman & Davis, LLC ("F&D"). Monster Content and its predecessors in interest (the "Licensor") are in the business of providing Internet-based data report products, including products marketed under the names "Channel Reports" and Listing Plus" which are at issue in this litigation. Homes (the "Licensee") is in the business of maintaining and managing web sites for Real Estate Agents and Brokers (the "customers").

Under a licensing agreement (the "Agreement") executed between MDI, as Licensor, and Homes, as Licensee, effective April 1, 2002, MDI agreed that Homes would provide its customers with direct access to several MDI products, including the products "Listing Plus," "Community Channel," and "Schools Channel," for a specified fee, paid by the customers and shared between the partes. The Agreement also provided that MDI "will provide to Licensee a bulk data delivery of a subset of the School data as a replacement for what is already on Licensee's site. This data will be updated annually on servers operated and maintained by Licensee." There was no fee under the Agreement for this bulk data delivery. Homes "went live" with the MDI products on May 1, 2002.

On or about April 26, 2002, MDI announced that it was ceasing operations and terminated its remaining employees. F&D purchased the assets of MDI at a foreclosure sale conducted by the secured creditor of MDI in July 2002. A substitute version of the agreement executed effective July 22, 2002 was identical to the Agreement except that it substituted F&D as the Licensor (the "Substitute Agreement"). On September 16, 2002, the assets were foreclosed a second time and sold to plaintiff Monster Content. Opp'n at 11-12.

Monster Content alleges that Homes breached the Agreement by providing its customers access to the Licensor's "Schools Lite" Channel ("Schools Lite"), a product that allegedly was not included in the Agreement, free of charge and without any compensation to Monster Content. Although it is undisputed that Homes provided its customers with access to Schools Lite, Homes

1  alleges that, in the course of the technical implementation of the Agreement in April 2002, MDI was
2  "unwilling or unable" to provide the bulk data delivery of school data as specified in the contract
3  and that "Homes suggested and MDI agreed as an alternative option to simply provide Homes with a
4  direct link" to Schools Lite.  Motion at 8-9.  On or about June 7, 2002, Homes requested the bulk
5  delivery of Schools Lite data, and such data was provided by the Licensor on or about June 28,
6  2002.

7        Monster Content contends that it discovered the alleged breach in February 2003 when
8  Homes sent its first accounting of revenue received under the Agreement, together with a check
9  purporting to cover the owed license fees.  At this time, Monster Content conducted an analysis that
10 revealed that Homes customers had been accessing Schools Lite since May 2002 with no
11 compensation to Monster Content.  On or about February 25, 2003, Monster Content asserted
12 Homes's breach of the Agreement, claiming that 54,546 Homes customers had improperly accessed
13 Schools Lite  since April 2002.  Although Homes denied any wrongdoing, Homes agreed to
14 terminate its customers' access to Schools Lite in April 2003.

15       Monster Content filed the present action on February 10, 2004.  On January 7, 2005, the
16 Court denied Homes's prior motion for partial summary judgment in which Homes argued that
17 Monster Content's claims were partially barred by Homes's prior bankruptcy proceeding.  The Court
18 found that Monster Content was entitled to summary adjudication on the issue that its claims were
19 not barred by the Homes bankruptcy.  Homes now files another motion for partial summary
20 judgment in which Homes argues that the Court should hold that the Agreement is ambiguous as a
21 matter of law and that all relevant extrinsic evidence, including the practical implementation of
22 Agreement as manifested by conduct, must be considered at trial.  Homes further contends that the
23 Court should find that the Agreements was interpreted and implemented by the contracting parties
24 with full knowledge that Homes was being provided with direct link to Schools lite without charge.
25 Monster Content argues that the contract language at issue is unambiguous in stating that the free
26 component was to be a bulk data delivery. Oppn. at 3.  Monster Content urges the Court to deny
27 Homes's motion for summary judgment and instead grant summary judgment sua sponte in its favor
28 \\\

3

1  by finding that the Agreement did not allow Homes to provide its customers with a free link to
2  Schools Lite.

3                                              DISCUSSION

4       The legal standard applicable to this summary judgment motion is set forth in the Court's
5  January Order.  Pursuant to the terms of the Agreement, the Agreement is governed by New York
6  law.  Under New York law, "A familiar and eminently sensible proposition of law is that, when
7  parties set down their agreement in a clear, complete document, their writing should as a rule be
8  enforced according to its terms." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y., 1990).
9  Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that
10 agreement.  *See CCG Assocs. I v. Riverside Assocs.*, 157 A.D.2d 435, 440 (N.Y. App. Div., 1990).
11 "It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a
12 written agreement which is complete and clear and unambiguous upon its face'" *W.W.W. Assocs.*,
13 *supra*, at 163.

14      Where the language of the contract is unambiguous, contract interpretation is a matter of law
15 and the case is ripe for summary judgment.  *See Pharmaceutical Horizons v. Sterling Drug, Inc.*, 127
16 A.D.2d 514, 515 (N.Y. App. Div., 1987).  *See also K. Bell & Assoc. v. Lloyd's Underwriters*, 97
17 F.3d 632, 637 (2d Cir. 1996). Contract language is not ambiguous unless "it is reasonably
18 susceptible of more than one interpretation, and a court makes this determination by reference to the
19 contract." *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 152 (2d
20 Cir. 1990).  In determining whether an ambiguity exists, a contract should be read as a whole.  *See
21 W.W.W. Assocs.*, *supra*, at 163.  The mere assertion by a party that contract language is ambiguous is
22 not, in and of itself, enough to raise a triable issue of fact precluding summary judgment.  *Lake
23 Constr. & Dev. Corp. v. City of New York*, 211 A.D.2d 514, 515 (N.Y. App. Div., 1995).

24      At issue in this action is the provision of the contract relating to the bulk data delivery. The
25 provision states that the Licensor "will provide to Licensee a bulk data delivery of a subset of the
26 School data as a replacement for what is already on Licensee's site. This data will be updated
27 annually on servers operated and maintained by Licensee."  Homes contends that the Agreement
28 does not define the terms that make up the phrase "bulk data delivery of a subset of the School data

4

1 as a replacement for what is already on Licensee's site." Motion at 5-6. Monster Content, however, submits that bulk data delivery is understood in the industry to refer to a "one-time (possibly updated from time to time) delivery or 'feed' of raw data that the recipient can access, use, manipulate, format and display at its will." According to the parties' Joint Statement of Undisputed Facts, Homes similarly understood this phrase "to refer to a one-time data feed that Homes could then store, manipulate, format and access from its own computers or servers." ¶ 10. Although the Agreement does not clearly state what data was to be included in the "subset of the School data," the content of the subset is not at issue in this case. Rather, the issue is whether that content would be provided by way of a bulk data delivery or a direct link. The phrase "as a replacement for what is already on Licensee's data" is given its plain meaning, that the bulk data delivery will take the place of another set of data that was previously on Homes's website. The contract also unambiguously stated that this data was to be "updated annually on servers operated and maintained by or at the direction of Licensee," namely Homes.

The Court finds that, to the extent they are relevant to the issues in this case, these contract terms, and the contract provision as a whole, are not "reasonably susceptible of more than one interpretation." The Agreement is unambiguous in providing for a free bulk data delivery of a set of data pertaining to schools. In a declaration submitted by Homes, Patricia Ann McNease states that "[d]uring the implementation of the MDI agreement, it was understood that Homes was looking to replace the school data which had been provided to its customers at no charge on both the Homes Portal and the AA/BA Sites by another provider, 2001Beyond.com," and that "Homes in fact preferred to obtain the school data in 'bulk' the way it had obtained the data from 2001Beyond." ¶¶ 14-15. The parties agree that "[t]he school data that was on Homes's website prior to the MDI agreement was data that Homes had obtained in bulk format from 2001Beyond, and was located and stored on Homes's servers and was accessed by customers from their websites for free through Homes' (sic) database, not by linking out to a third-party website." Joint Statement, ¶ 11. The parties further agree that bulk data pertaining to schools was delivered to Homes on June 28, 2002, subsequent to Homes's request for it on June 7, 2002. Joint Statement, ¶¶ 21-22. Given these facts,

\\\

there is no reasonable doubt that Homes and MDI contracted for a free bulk data delivery rather than for a free direct link to the school data.

CONCLUSION

For the reasons set forth above, the Court DENIES Homes's motion for partial summary judgment. Because the Court's determination that the contract is not ambiguous is the law of the case, there is no reason for the Court to take the allowable but unusual step of making a sua sponte ruling of summary judgment in favor of the non-moving party. With this ruling, the Court expects that trial in this matter will focus on damages, an issue over which there are substantial and valid disputes.

**IT IS SO ORDERED.**
Dated: May 19, 2005                                            /s/
                                              _____
                                              FERN M. SMITH
                                              UNITED STATES DISTRICT JUDGE