United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MONSTER CONTENT, LLC,

          Plaintiff,

   v.

HOMES.COM, INC.,

          Defendant.

_____/

No. C 04-0570 FMS

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

INTRODUCTION

    Plaintiff Monster Content, LLC ("Monster Content") filed suit against defendant

HOMES.COM, INC. ("Homes") on February 10, 2004 alleging breach of contract.  The contract in

dispute was a licensing agreement under which Homes provided its customers with access to various

products marketed under the names of "Channel Reports" and "Listings Plus" developed by

plaintiff's predecessor-in-interest, MonsterDaata ("MDI").  By Order dated January 7, 2005, the

Court denied a motion for partial summary judgment filed by Homes and found that Monster

Content's claim was not barred by Homes's completed bankruptcy proceeding.  By Order dated May

19, 2005, the Court denied another motion for partial summary judgment filed by Homes and found

**United States District Court**
For the Northern District of California

that there was no ambiguity as to the delivery method intended for the "subset of the School data" referenced in the licensing agreement.  The case was tried to the Court from June 20, 2005 to June 21, 2005.  The Court's Findings of Fact and Conclusions of Law follow.

FINDINGS OF FACT

The Parties

1.  Monster Content is the successor, by a series of asset purchases, to the assets of two predecessor owners, MDI and Fishman & Davis, LLC ("F&D"). (Monster Content, MDI and F&D are sometimes hereafter referred to individually or collectively herein as the "Licensor").  Among the MDI/F&D assets acquired by Monster Content were the products and databases at issue in this litigation.

2.  The Licensor was in the business of providing Internet-based data report products, including various products marketed under the names "Channel Reports" and "Listing Plus." "Channel Reports" products, included, inter alia,  "People," "Equipment," "Money," "Lifestyle," "Community," "Schools" and "Schools Lite."  "Schools Lite" was both a "Channel Reports" product and a "subset" of the "Schools" "Channel Reports" product in that it included some, but not all of the features offered in the full "Schools" product.  Statement of Undisputed Facts (hereinafter, "SUF"), ¶ 11.

3.  MDI ceased its business operations on or about April 26, 2002, although its services to customers were continued through the efforts of former employees working in cooperation with MDI's secured creditor, Commerce Capital, L.P. SUF, ¶ 16.

4.  Since 1998, Homes has operated an internet-based real estate listing service centered around a consumer portal located at www.homes.com© (the "Homes Portal"), and websites sold to and maintained for real estate agents and brokers (the "Agent Advantage/Broker Advantage Sites" or "AA/BA" sites). SUF, ¶ 2.

5.  Homes receives a one-time up front fee from the sale of the AA/BA Site templates to brokers and agents who then with the assistance from Homes, create and set up their own AA/BA Site, which is then also linked to the Homes Portal.  SUF, ¶ 3.

\\\

United States District Court

For the Northern District of California

6.    In addition to the one-time up front fee, Homes charges recurring monthly fees to all of its customers with AA/BA Sites, and during the time of the transactions at issue in this case, the basic monthly fees, without "add-ons" was $59.00 per month for each AA site and $99.00 per month for each BA site.

7.    On or about March 23, 2001, Homes filed a Chapter 11 bankruptcy in the Northern District of California, Case No. 01-30698-SFM11 (the "Homes Bankruptcy").  SUF, ¶ 5.

The Agreement

8.    On or about March 18, 2002, with an effective date of April 1, 2002, MDI as Monster Content's predecessor-in-interest and as Licensor, and Homes as Licensee, entered into the license agreement which is the subject of this case (the "Agreement").  See Ex. 1.

9.    A substitute version, executed effective July 22, 2002, was identical to the first version except that it substituted F&D as the Licensor, following F&D's purchase of substantially all of MDI's assets. See Ex. 2.  Monster Content subsequently purchased substantially all of the MDI/F&D assets, and brought this action as the owner of the licensed products and all of the rights of the Licensor under the Agreement.

10.    The recital paragraph of the Agreement sets forth the purpose of the contract, that the "Licensee wishes to license [the Licensor's] "Listing Plus and Channel products ("Products") . . . in accordance with the terms and conditions set forth herein, which will enable Licensee to incorporate certain neighborhood information content into the web sites it provides for Licensee Customers as a value added enhancement." Ex. 1 at 1.

11.    In Section IV, the Agreement set forth the prices to be charged to Licensee customers for Listing Plus and two Channel products, "Community" and "Schools"  (the "Licensed Products" ) as follows: " (i.)  Listing Plus - $19.95 per month or annualized and paid up front at $199; (ii.)  Channels (Community and School combined) - $19.95 per month or annualized and paid up front at $199; (iii.) Both Listing Plus and Channels - $29.95 per month or annualized and paid up front at $299."  The parties were to share the revenue from the Licensed Products equally, after a 4% deduction to the billing party for merchant bank charges.  *Id.* at 3.

3

**United States District Court**
For the Northern District of California

12. Section 1.1 of the Agreement provides that the Licensed Products were to be hosted and maintained on "servers operated and maintained by or at the discretion of the Licensor," with Homes's Customers to be granted direct access to the Products through the Internet.  The Licensor, in turn, agreed to provide "reasonable communications bandwidth" to enable access to the Products by Homes and its Customers.  *Id.* at 1.

13. In addition, Section 1.1 of the Agreement also provided that the Licensor would provide Homes with a "bulk data delivery of a subset of the School data as a replacement for what is already on Licensee's site.  This data will be updated annually on servers operated and maintained by Licensee." *Id.*

14. Homes and Monster Content agree that the term "bulk data delivery" as used in the Agreement refers to a one-time data feed that Homes could then store, manipulate, format and access from its own computers or servers.  *Cf.* SUF, ¶ 12.

15. The school data that was already on the Homes Portal prior to the MDI Agreement was data that Homes had obtained in a bulk format from 2001Beyond, and was located and stored on Homes's servers and was accessed by customers from their websites for free through Homes's database, not by linking out to a third-party web site.  SUF, ¶ 13.

16. At the time the Agreement was signed, Homes preferred to obtain the school data in "bulk" the way it had obtained the data from 2001Beyond because getting the bulk data gave Homes and its AA/BA customers more control over how the content would be displayed and formatted, and thereby precluded customers from leaving either the Homes Portal or the particular AA/BA Site as a result of a link.

17. The Agreement does not provide for any payment to be made by Homes or Homes's customers for the "bulk data delivery of a subset of the School data."  SUF, ¶ 14.  If fact, the Agreement was admittedly intended to provide this information for free.

18. Section 2.1 of the Agreement provides, in relevant part, as follows: "Licensee acknowledges and agrees that it may not reproduce, sell, sub-license, create derivative works from, transfer or otherwise derive revenue from the MonsterDaata Content, except as expressly provided... Except as set forth in this agreement... Licensee may not use the MonsterDaata Content for

4

United States District Court

For the Northern District of California

any other purpose and may not reproduce or provide the MonsterDaata Content in any other format."

19.  Section 10.5 of the Agreement states that it shall be governed by New York law.

20.  With MDI's knowledge, Homes had entered into another agreement with eSchool Profile ("eSchool") to provide school data by way of a direct link from the Homes Portal and AA/BA Sites for a flat annual fee of $5,000, also effective April 1, 2002 (the "eSchool Agreement").

The Implementation of the Agreement with respect to the School data

21.  Beginning in mid-March 2002, the technical programmers for MDI and Homes sought to implement the terms of the MDI Agreement.  SUF, ¶ 15.

22.  In late March and early April, the Homes technical programmers exchanged internal emails discussing how to implement the part of the agreement pertaining to the free School data, as documented below.  On April 5, 2002 a conference call was held that included technical programmers for both Homes and MDI.

23.  At Homes's request, MDI provided Homes with a separate link to the Schools Lite channel on or about April 5, 2002 (the "Schools Lite link").  SUF, ¶ 18.

24.  MDI  did not provide any school data in bulk to Homes prior to MDI ceasing business operations on or about April 26, 2002.  SUF, ¶ 17.

25.  Beginning on May 1, 2002, Schools Lite became the "default" school information on the AA/BA Sites.  SUF, ¶ 19.

26.  Homes issued what it referred to as a joint press release with MDI announcing the availability of the Products under the MDI Agreement on May 1, 2002.  SUF, ¶ 20.

Changes in the Licensor's Business and Discovery of the Alleged Breach

27.  Prior to MDI ceasing operations on or about April 26, 2002, MDI's secured lender, Commerce Capital, L.P. ("Commerce") had a business relationship with Matthew Greene ("Mr. Greene") (who later became Monster Content's principal) and his company, Linux HPC ("Linux").  SUF, ¶ 24.

\\\

5

United States District Court

For the Northern District of California

28. After MDI ceased operations on or about April 26, 2002, Commerce requested Mr. Greene/Linux to provide technical software consulting services to MDI's Vice President of Business Development, Andrew Fishman ("Fishman"), and MDI's Vice President of Sales and Marketing, Brent Davis ("Davis"), who had expressed interest in acquiring all of MDI's assets from Commerce.  SUF, ¶ 25.

29. On July 3, 2002, F&D acquired substantially all of MDI's assets at a private foreclosure sale by Commerce (the "First Foreclosure").  SUF, ¶ 30.

30. The MDI Agreement was terminated and the F&D Agreement executed on or about July 22, 2002.  SUF, ¶ 31.

31. Homes's customers continued to be provided with free access to Schools Lite through the Schools Lite Link after the First Foreclosure.  SUF, ¶ 32.

32. F&D defaulted on its loan obligations to Commerce and Commerce exercised its proxy rights to remove Messrs. Fishman and Davis and to appoint Mr. Greene to assume responsibility for the management and day-to-day business operations of F&D on or about September 4, 2002.  SUF, ¶ 36.

33. Mr. Greene managed F&D's business operations pending the foreclosure on F&D's assets by Commerce (the "Second Foreclosure"), and the sale of the assets to Monster Content on or about September 17, 2002.  SUF, ¶ 37.

34. At the time Monster Content acquired all of F&D's assets through the Second Foreclosure by Commerce, approximately 8% of F&D's revenues were generated by all of the Channel products.

35. At all times between September 16, 2002 and July 1, 2004, in his capacity as Monster Content's Chief Manager, Mr. Greene was responsible for managing Monster Content's day to day business operations.  SUF, ¶ 40.

36. Mr. Greene did not review the terms of the Agreement until sometime between September 16, 2002 and November 2002, after Monster Content acquired F&D's assets through the Second Foreclosure.  SUF, ¶ 41.

\\\

6

**United States District Court**
For the Northern District of California

37.   At or about the time Mr. Greene reviewed the Agreement sometime between September 16, 2002 and November 2002, Mr. Greene also reviewed financial books and records of the company.  SUF, ¶ 42.

38.   It was Homes's responsibility to report revenues under the Agreement, and also Homes's responsibility to collect from its customers to pay Monster Content its share of the revenue pursuant to the Agreement.  SUF, ¶ 44.

39.   At the time Mr. Greene reviewed the server reports sometime in the fall or winter, he was surprised there were significant volumes of requests by Homes's customers, and became concerned Homes had not made any payments or provided any monthly reports as required under the Agreement.  SUF, ¶ 45.

40.   Based upon Mr. Greene's review of the Agreement, the server logs and financial books and records, Mr. Greene believed between September 16, 2002 and November 2002, that Homes's customers were improperly obtaining access to Monster Content's Products without charge, but he did not discuss the fact with any representative of Homes.

41.   On October 9, 2002, Homes sent an email to Annessa Becker at Monster Content regarding "MonsterDaata Schools Lite Issue (new)," stating that "[t]he Schools Lite feed that we used for the portal for schools information appears to have stopped working: the URL that should be displayed comes back with a '500 Server error.'"  SUF, ¶ 46.  The problem was corrected by Monster Content soon after.

42.   In mid-February 2003, Homes sent its first payment and report of revenue that it acknowledged was owed to Monster Content under the Agreement, including payments for a share of fees received by Homes in each month between May 2002 and January 2003, inclusive.  SUF, ¶ 51.  The Homes payment report reflected less than 30 paying customers. Payments under the Agreement totaled $6,861.36.

43.   Because of the small amount of the payment, Mr. Greene decided to perform an analysis of the server logs to determine the number of Homes customers that had actually accessed the Channel products.  Mr. Greene concluded that 54,546 Homes customers had improperly accessed Schools Lite between May of 2002 and February of 2003.

**United States District Court**
For the Northern District of California

44. On or about February 25, 2003, Monster Content notified Homes of the alleged breach of the Agreement. SUF, ¶ 52.

45. Homes denied any wrongdoing under the Agreement, but voluntarily agreed to terminate the Schools Lite link from either the Homes Portal or AA/BA Sites in April 2003. SUF, ¶ 53.

46. Homes would have immediately terminated the School Lite link if at anytime prior to being provided the Greene Analysis in February 2003, it had been informed by Monster Content or F&D and MDI as Monster Content's predecessors-in-interest that its access to the Schools Lite link was improper.

47. Upon terminating the use of the Schools Lite link, Homes made eSchool the primary provider of its free schools data for the AA/BA Sites and Homes Portal, by way of a direct internet link to eSchool.

48. Pursuant to the eSchool Agreement, Homes initially paid eSchool the annual sum of $5,000 for the free school data on the Homes Portal and AA/BA Sites, later increased to $10,000 as of April 1, 2004.

49. In July 2004, Mr. Greene transferred his interest in Monster Content to Commerce in full and complete satisfaction of Monster Content's obligation owing to Commerce.

50. On or about September 7, 2004, Monster Content ceased conducting business and terminated access to the Licensed Products to Homes's paying customers under the Agreement.

CONCLUSIONS OF LAW

Breach of Contract

1. Plaintiff contends that Homes breached the Agreement by providing to its customers the right to direct access to the Schools Lite product, free of charge and without any compensation to Plaintiff. Plaintiff specifically contends that Homes breached Section 2.1 of the Agreement, which prohibited Homes from reproducing, selling, transferring or otherwise deriving revenue from the MDI Content, except as expressly provided in the Agreement. In order to prevail on a breach of contract claim under New York law, a plaintiff must prove, by a preponderance of the evidence: (1) the existence of a contract; (2) adequate performance of

United States District Court

For the Northern District of California

1  the contract by the plaintiffs; (3) breach of contract by the defendant; and (4) damages. *See*

2  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).

3  2.  The Court finds that the Agreement was not breached because Schools Lite was not part of

4  the Agreement.  In the Agreement, there is no mention of the Schools Lite product and there

5  was no provision of payment for the Schools Lite product.

6  3.  Although Schools Lite was not a part of the Agreement, the Agreement provided for a free

7  "bulk data delivery of a subset of the School data." As previously stated in this Court's Order

8  of May 19, 2005, "there is no reasonable doubt that [the parties] contracted for a free bulk

9  data delivery rather than a free direct link to the school data."  The Court's Order of May 19,

10  2005 also states, "Although the Agreement does not clearly state what data was to be

11  included in the 'subset of the School data,' the content of the subset is not at issue in this

12  case.  Rather, the issue is whether that content would be provided by way of a bulk data

13  delivery or a direct link."  The Court thus previously found that, under the Agreement,

14  Homes was entitled to the content of the Schools Lite product in the format of a bulk data

15  delivery.

16  4.  Even if the Court found that Homes breached the Agreement, the Court would have only

17  found a breach as to the delivery method or format of the Schools Lite data and not as to its

18  content.

19  Acquiescence and Ratification

20  5.  Homes raises acquiescence and ratification as an affirmative defense.  The Court finds that

21  Homes has carried its burden of showing that the Licensor acquiesced to and ratified the

22  decision to substitute the link to Schools Lite for the "bulk delivery of a subset of School

23  data." On this basis, the Court finds that Monster Content is barred from asserting its claim.

24  6.  Under New York law, acquiescence is defined as follows: "When a party with full

25  knowledge, or with sufficient notice of his rights and of all the material facts, freely does

26  what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a

27  manner inconsistent with its repudiation, and so as to affect or interfere with the relations and

28  situation of the parties, he acquiesces in and assents to it and is equitably estopped from

9

**United States District Court**
For the Northern District of California

1    impeaching it, although it was originally void or voidable." *Bisbing v. Sterling Precision*

2    *Corp.*, 34 A.D.2d 427, 430-431 (N.Y. App. Div., 1970), *citing Metropolitan Life Ins. Co. v.*

3    *Childs Co.*, 230 N. Y. 285, 292; *Wikiosco, Inc. v. Proller*, 276 App. Div. 239; *Posner v. New*

4    *York Mut. Underwriters*, 33 Misc 2d 653, affd. 16 A D 2d 1013.

5    7.    A ratification in the contractual context is defined in modern legal usage as "[a] person's

6    binding adoption of an act already completed but . . . not done in a way that originally

7    produced a legal obligation." Black's Law Dictionary 290 (8th ed. 2004). It is a generally

8    accepted principle that a voidable contract can be cured by ratification through express or

9    implied conduct, but that a person "charged with ratification of such a contract must have

10   acted voluntarily and with full knowledge of the facts." 17A Am. Jur. 2d Contracts § 11

11   (2004). Moreover, a party asserting the defense of ratification of a voidable contract

12   ordinarily must demonstrate that the releasor intended to ratify the agreement. *See Kovian v.*

13   *Fulton County Nat'l Bank & Trust Co.*, 857 F. Supp. 1032, 1040 (N.D.N.Y. 1994) (holding

14   that the issue of intent to ratify a release was a question of material fact).

15   8.    The Court finds that the Licensor's conduct satisfies the elements of acquiescence and

16   ratification.

17   9.    During the implementation of the Agreement, the correspondence between the parties and

18   their conduct supports an inference that the Licensor's representative Henry (Hank) Hubbard

19   ("Hubbard") agreed to the suggestion by Homes's representatives that Homes use Schools

20   Lite data in the form of a direct link rather than in the  form of a bulk data delivery.  The

21   evidence supporting this conclusion includes the following course of correspondence and

22   conduct:

23            -    On Wednesday, March 27, 2002, Henry Hubbard ("Hubbard"), a

24   representative of MDI, wrote an email to Homes representatives, Joel Parramore

25   ("Parramore") and Russell de Grove ("de Grove"), which included a link giving

26   Homes access to Channel Reports and Listing Plus, which were covered under the

27   Agreement as Licensed Products.  See Ex. 36, at Homes 42.

28

10

United States District Court

For the Northern District of California

1    -    On Friday, March 29, 2002, Parramore requested that Hubbard add Schools

2    Lite to the Channel Reports to which Homes had access "so that we can compare

3    against the full Schools report."  On the same day, Hubbard responded "I should have

4    thought about that the first time around! Done..." See Ex. 36, at Homes 42.

5    -    On Friday, March 29, 2002, Parramore suggested to other Homes employees

6    Patty McNease ("McNease") and de Grove, "MonsterDaata's Schools Lite Channel

7    looks to have most of what we offer now.  What if we simply picked that as the

8    "freebie" to display on the portal and AA/BA sites and just had their full schools as

9    the "up-sell"?  See Ex. 36, at Homes 57.

10    -    On Wednesday, 4/3/02, email communications among Hubbard, de Grove and

11    Parramore suggested that there would be a conference call about the "import of

12    limited school data" on Thursday, 4/4/02 at 3 pm.   Ex. 36, at Homes 52.

13    -    On Wednesday, 4/3/02, Parramore suggested two options to de Grove

14    regarding how to use the Schools Lite data:  "Getting Schools Lite and displaying

15    some subset of it ourselves is one option; opening another window and simply

16    framing Schools Lite for the freebie (and the full Schools channel if they've paid) is

17    the other ... If agents/brokers squawk about it not being in-line, that's a concern, but

18    from the portal perspective, displaying in a frame (a la how "partners" are handled)

19    would be almost trivial."  Parramore responded, "I'd rather wait and let all three of us

20    meet on this."   Ex. 36, at Homes 60.

21    -    On Wednesday, 4/3/02, de Grove sent an email to other Homes employees

22    McNease, Parramore, and Perkins to show them how the Schools Lite link could be

23    used.  The email stated "These pages assume we will simply use Schools Lite, hosted

24    at their end, to replace our current school product (John, FYI, it occurred to Patty and

25    me that if channels is a link-out, as it has to be, then perhaps the default ought to be

26    too.) I figured I'd let you guys look at these before running them by monster."  The

27    email also states, "This is probably the easiest approach.  If we want to go this way,

28    and Monster is OK with it, then all we need to do is decide whether to replace the text

11

**United States District Court**
For the Northern District of California

links on the listing detail with graphics.  I have a tool member services can use to activate/deactivate Monster products. Selling and billing still need to be worked out. We'll need Monster to give us a separate Schools Lite only account... otherwise you can jump from Lite to the other channels..." Ex. 36, at Homes 61-62

- On Thursday, 4/4/02, the conference call to review "implementation of ListingsPlus and uploads of school data" was rescheduled by Parramore and Hubbard to Friday, 4/5/02 at 3:00 pm.   Ex. 36, at Homes 67.

- After the scheduled conference call, on Friday, 4/5/02 at 3:58 pm, Hubbard sent Parramore and de Grove an email which provided Homes with a separate link to the Schools Lite channel.  In the email, Hubbard stated, "Hey guys - here is the service package info for Schools Lite (I removed schools lite from the original service package)."  Parramore responded, "Thanks, Hank [Hubbard]." Ex. 36, at Homes 74.

- On Monday, 4/8/02, Parramore sent Hubbard an email with the subject, "MonsterDaata presentation on the Homes.com portal."  In the email, Parramore stated, "We present school data in two areas of the portal: underneath a listing's detail and underneath the "Neighborhoods" area.  Essentially, where we were displaying data in the page before, a pop-up window containing the MonsterDaata data will open, and some explanatory text will be displayed on the Homes.com listing page instead.  I've provided a couple URLs for you to view what I've done..."  Hubbard responded, "Joel - looks good.  Let me know if there's anything else you need from me..." Ex. 35, at Homes 76.

- On May 1, 2002, Homes "went live" with its offering of MDI  Channel products (Schools and Community) to its agent and broker customers. Also on May 1, 2002, Schools Lite became the "default" school information on the AA/BA Sites. SUF, ¶ 19.

- The 4/8/02 email correspondence is the last in the record that concerns schools data before the products "went live."

United States District Court

For the Northern District of California

-       On 4/23/02, MDI's Director of Marketing Charles Ix wrote an email to Perkins with the subject "Implementation."  The email stated, "John: I spoke with Hank [Hubbard] on our end and he has given your tech guys everything they have asked for.  Do you have a feel for the time frame for implementation?  Thanks." Ex. 45.

-       On 6/6/02, Parramore sent an email to other Homes employees stating, "Talking with Hank [Hubbard] and Mark [Hensein] originally, they had agreed to provide us with a  copy of their "Schools Lite" data (refreshed once or twice a year -- what does the contract say on that?) for local use on our AA/BA and portal sites, if and when we wanted to control presentation of the data as we were doing with 2001Beyond/eSchoolProfile originally.  So, we want a copy of that data as soon as we can get it." Ex. 37 at TAL 1079.

-       On 6/7/02, Homes sent an email to Andrew Fishman, representing the Licensor, requesting the bulk data.  Ex. 62 at Homes 132.  On 6/25/02, a representative of the Licensor sent the file containing the school data in bulk to Parramore.  Ex. 62 at Homes 161.  After receiving the bulk data, Homes did not take any steps to format it into a usable form.

10.    In addition to the evidence contained in the record of emails, the following relevant testimony was offered:

-       De Grove testified by deposition that the Schools Lite link that Hubbard sent was in response to his stated need to have a separate schools lite link in order to implement the Monster Demo that he had designed using the link. Ex. 78 at 83:17 - 84:3.  DeGrove also says "I am sure that, at some point, I communicated to them that it was my intention to provide Homes (sic: Schools) Lite content without charge to our customers." Ex. 78 at 85:13-16.

-       Hubbard testified by deposition that there was no agreement between the parties that the direct link to Schools Lite would be used instead of bulk data.  Ex. 28

United States District Court

For the Northern District of California

1   at 77:8-78:2.  He further states that "that is something we would not have agreed

2   upon." *Id.*

3   -   Hubbard testified that he agrees that the email with the separate link seems to

4   have been sent after the conference call in which the issue of using the Schools Link

5   was purportedly discussed. Ex. 28, 95:14 - 96:4.  He testified that his reason for

6   sending Homes the separate link was "there was some concern that Schools Lite

7   would be accessed by someone that didn't have privilege to it.  So, we wanted to

8   remove it from their production service package and put it into its own individual

9   service package so that [Homes] could continue to investigate." *Id.*

10  -   Fishman, who was Vice President of Business Development at MDI when the

11  Agreement was negotiated and who purchased the assets of MDI after MDI ceased

12  operations does not recall any concerns with the fact that Homes was using a link to

13  Schools Lite.  Ex. 79 at 103: 9-14.  He testified that he was not concerned that too

14  much information was being provided for free. *Id.* at 129: 4-6.

15  11.  The Court finds that the factual evidence supports an inference that the use of the Schools

16  Lite link by Homes was discussed in the conference call that took place between

17  representatives of Homes and MDI on April 5, 2002.  The Court notes that the internal

18  emails of Homes representatives do not demonstrate any intent to hide the fact that Homes

19  was considering the option of using the Schools Lite link rather than the bulk data.  The

20  Court is particularly persuaded by the facts that de Grove stated in an email on the day before

21  the April 5 conference call that he planned to "[run] it by monster" and that  "if Monster is

22  OK with it... [w]e'll need Monster to give us a separate Schools Lite only account" and that

23  on April 5, after the conference call, Hubbard sent Parramore and de Grove a separate

24  Schools Lite link.  The Court's opinion that Hubbard agreed to the Homes representatives'

25  plan to use the Schools Lite link is further buttressed  by the fact that there were no more

26  email discussions with respect to the free Schools data before the products went live on May

27  1, 2002.

28  \\\

14

12.   The Court acknowledges that Hubbard's testimony is inconsistent with this Court's finding, but the Court believes that the contemporaneous emails and conduct at time of transaction are more credible evidence to discern the truth of what happened than the statements of the interested witnesses several years later in preparation for litigation.

13.   While plaintiff states that "Mr. Hubbard did not have the authority to agree to any modification of the Homes Agreement," the Court finds that Hubbard had apparent authority. "A principal drapes its agent with apparent authority by holding its agent out in such a way that causes a reasonable third party to believe that the agent is authorized to enter into the transaction in question." EUA Cogenex Corp. v. North Rockland Cent. Sch. Dist., 124 F. Supp. 2d 861, 869-870 (D.N.Y., 2000) (citing Hallock v. State, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984)). Apparent authority depends upon outward appearances, and thus can exist even in the absence of actual authority. It requires the following two elements: (1) the principal must, by words or conduct, create an appearance of authority in the agent; and (2) the third party must reasonably rely on that appearance of authority. See FDIC v. Providence College, 115 F.3d 136, 140 (2d Cir. 1997).

14.   The evidence supports a finding that MDI created the appearance of authority in Hubbard.  In an email dated 3/18/02, Homes Chief Operating Officer Perkins sent an email to MDI Vice President of Business Development Fishman to put his technical team in contact with MDI's technical team.  The email stated, "Andrew [Fishman], I didn't have your tech team emails so please forward this to them so that they can get with our tech team."  Perkins copied his team members' emails on the email (Parramore, Larry Reinhard, and de Grove) and attached a copy of the Agreement. In an email dated 3/19/02, Hubbard wrote an email in response stating to all recipients, "Hey guys - I'm the CTO here at MonsterDaata. Let me know when you are ready to start discussing this implementation."  Another MDI employee, Mark Hensein, was also copied on the email.

15.   The evidence also supports a finding that Homes's representatives reasonably relied on the appearance of Hubbard's authority.

\\\

15

**United States District Court**
For the Northern District of California

Equitable Estoppel

16. Homes raises equitable estoppel as an affirmative defense.  The Court finds that Homes has carried its burden of showing that Monster Content is equitably estopped from asserting its claim.

17. The doctrine of equitable estoppel precludes a party at law and in equity from denying or asserting the contrary of any material fact which he has induced another to believe and to act on in a particular manner.  *Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 234-235 (N.Y. App. Div., 1982)  It "'rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury'"  *Id.,* citing *Triple Cities Constr. Co. v Maryland Cas. Co.*, 4 NY2d 443, 448; *Metropolitan Life Ins. Co. v Childs Co.*, 230 NY 285, 292. Parties are estopped to deny the reality of the state of things which they have made to appear to exist and upon which others have been made to rely.  *Holm*, 89 A.D.2d at 234.  It does not operate to create rights otherwise nonexistent; it operates merely to preclude the denial of a right claimed otherwise to have arisen.  *Id.,* citing 21 NY Jur, Estoppel, Ratification, and Waiver, §§ 17-18.

18. Estoppel requires three elements on the part of the party estopped: (1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true facts.  *Id.*, citing 21 NY Jur, Estoppel, Ratification, and Waiver, § 21.  The party asserting estoppel must demonstrate detrimental reliance by showing (1) lack of knowledge of the true facts; (2) good faith reliance; and (3) a change of position.  *Id.*, citing 21 NY Jur, Estoppel, Ratification, and Waiver, § 60.

19. For the reasons stated in support of the Court's finding of acquiescence above, the Court finds that the Licensor induced Homes by word and deed to believe that Homes could substitute the Schools Lite link for the bulk data delivery under the Agreement.  The Court finds that the conduct of the Licensor was calculated to convey that Homes could use the Schools Lite link in the way that it did; that the Licensor intended that Homes act upon its

United States District Court

For the Northern District of California

1   conduct acquiescing to Homes's use of the link; and that the Licensor had constructive or

2   actual knowledge that Homes was using the link.

3   20.   The Court also finds that Homes detrimentally relied on the words and conduct of the

4   Licensor. The Court finds that Homes would have immediately defaulted to its alternative

5   provider of school information, eSchool, had it been informed by Monster Content or F&D

6   and MDI as Monster Content's predecessors-in-interest that Homes would be subject to the

7   alleged fees claimed in this action as a result of the Schools Lite Link.

8   Section 15-301 of the N.Y. General Obligations Law

9   21.   Plaintiffs contend that oral modification of the Agreement is not allowed under Section 15-

10   301 of the N.Y. General Obligations Law. This section provides: "A written agreement or

11   other written instrument which contains a provision to the effect that it cannot be changed

12   orally, cannot be changed by an executory agreement unless such executory agreement is in

13   writing and signed by the party against whom enforcement of the change is sought or by his

14   agent."

15   22.   The Court finds that the Agreement is not subject to Section 15-301 of the N.Y. General

16   Obligations Law because the Agreement does not strictly proscribe oral modifications.

17   Provision 10.1 of the Agreement states "The parties hereto *may*, by written agreement signed

18   by the parties, modify any of the covenants or agreements or extend the time for the

19   performance of any of the obligations contained in this Agreement or in any document

20   delivered pursuant to this Agreement" (italics added).  It does not unambiguously preclude

21   oral modifications.

22   23.   Even if Section 15-301 of the N.Y. General Obligations Law did apply, the facts in the case

23   would justify an exception under New York law.  A court may consider oral modifications to

24   such a contract if there has been "partial performance of the oral modification sought to be

25   enforced." *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 343, 366 N.E.2d 1279, 397

26   N.Y.S.2d 922, 926 (1977). Likewise, a party may be equitably estopped from invoking a

27   clause forbidding oral modifications where that party "has induced another's significant and

28   substantial reliance upon an oral modification."  *Id*. at 344, 397 N.Y.S.2d at 927. "For either

17

exception to apply, the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the [written] agreement." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990). Moreover, such conduct must be "unequivocally referable" to the oral modification. Rose, 42 N.Y.2d 343, 344, 397 N.Y.S.2d at 926, 927. A showing by the plaintiff that the oral agreement gives significance to the conduct at issue will not suffice. *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 450 N.E.2d 215, 216, 463 N.Y.S.2d 409, 410 (1983). Plaintiff must demonstrate actions that are "unintelligible or at least extraordinary, explainable only with reference to the oral agreement." *Id.* (internal citations and quotations omitted).

24.     For the reasons discussed above, the Court finds that Monster Content induced significant and substantial reliance on the oral modification consisting of the substitution of the Schools Lite link for the bulk delivery of Schools Lite data.  The court also finds that Hubbard's conduct of sending the separate Schools Lite link on April 5, 2002 is inconsistent with the Agreement and "unequivocally referable" to the oral agreement.  The Court finds that if there had not been an agreement by the Licensor that Homes could use the Schools Lite link in the way that it did, then Hubbard would not have separated out the link and sent it to Homes after the conference call.

Damages

25.     Plaintiff claims damages of over $1.3 million dollars for the alleged breach of the Agreement.  For the reasons stated herein, even if the Court had found a breach of the Agreement, the Court would have found damages in the amount of approximately $5,000.

26.      Monster Content claims that damages should be based on multiplying the number of Homes clients that had access to Schools Lite by a monthly subscription fee for the period between May 2002 and April 2003.  As of May 1, 2002, Homes had 12,014 active agent websites and 506 active broker websites.  Homes customer accounts steadily declined by approximately 13% between May 2002 and April 2003.

27.     The object of the law in affording damages in a breach of contract action is to compensate or indemnify the injured party so as to put it in as good a position as it would have been had the

18

1  defendant abided by the agreement. *Western Geophysical Co. of Am. v. Bolt Assocs., Inc.*,

2  584 F.2d 1164, 1172 (2d Cir. 1978); *see also Menzel v. List*, 24 N.Y.2d 91, 246  (1969) (New

3  York follows "expectation" theory of recovery in breach of contract action).

4  28.   The Agreement does not provide any specific pricing, or for payment of any kind by Homes

5  for the Schools Lite link.

6  29.   Monster Content did not present any evidence that it lost any reasonably ascertainable

7  customers through Homes's use of the Schools Lite link.

8  30.   Monster Content did not present to the Court any evidence of costs that were actually

9  incurred by Monster Content in providing the Schools Lite link to Homes's customers.

10  31.   Monster Content did not present any evidence to the Court that Homes's provision of

11  Schools Lite link to its clients enabled Homes to derive any additional revenue than it would

12  have derived without the Schools Lite link.  Indeed, the evidence shows that the number of

13  Homes clients declined over the period that Homes provided the link to its customers.

14  32.   The general rule that in an action to recover damages for breach of contract the injured party

15  is entitled to recover all of its damages is subject to three limiting conditions: (1) that the

16  injured party cannot recover damages for a loss that could have reasonably been avoided if

17  that party had taken appropriate steps to do so; (2) that the damages must be reasonably

18  within the contemplation of the parties at the time the contract was made; and (3) the

19  damages must be reasonably definite and certain.  3 Farnsworth on Contracts § 12.8, at

20  188-89 (1990) .

21  33.   The three limiting conditions are all applicable in this case.  With respect to the first, the

22  Court finds that the Licensor could have reasonably avoided any claimed damages incurred

23  by Homes's use of the Schools Lite link if it had taken appropriate steps, including not

24  engaging in a course of conduct that amounted to acquiescence to the substitution of the link

25  for the bulk data delivery.  At the very least, the Court would find that Monster Content

26  could have avoided its alleged damages incurred after the fall of 2002 when Monster Content

27  admits that it realized that Homes customers were accessing Schools Lite and when Monster

28

**United States District Court**
For the Northern District of California

Content restored the access of Homes customers to Schools Lite after Homes notified Monster Content that its customers were receiving an error message.

34.   With respect to the second limiting condition, the Court finds that Monster Content's proposed damages were not within the reasonable contemplation of the parties at the time the contract was made.  The Court finds that the amount of damages that Homes could have reasonably contemplated would be the fair market value of the Schools Lite link, best calculated based on the value of similar products in the marketplace.

35.   With respect to the third limiting condition, the Court finds that the damages proposed by Monster Content are not reasonably definite and certain.  Monster Content did not present evidence that any, let alone all, Homes customers would have paid an additional fee for the data contained in the Schools Lite link.  Monster Content cites authority that applies in situations where the existence of damage is certain. See Plaintiff's Post-Trial Brief at 19 (*citing InduCraft Inc. v. Bank of Baroda,* 47 F.3d 490, 496 (2d Cir. 1995) ("when it is certain that damages have been caused by a breach of contract...") and *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1997) ("under the long-standing New York rule, when the existence of damage is certain, and the only uncertainty is as to its amount...")  Because damages are not certain in this case, these cases are inapposite.

36.   The evidence showed that MDI's liabilities exceeded its assets when it ceased operations on April 26, 2002, with only eleven customers for all of its "Channel Reports" products.  These customers represented billings of $15,000 a month and the company had a liquidation value of $200,000.  The evidence also showed that during the period of time the Schools Lite link was provided to Homes's customers, Monster Content's average monthly cash-based sales totaled only $3,500 for all seven of its "Channel Reports," of which Schools Lite was only one.  Plaintiff was unable to attribute any specific amount to Schools Lite separately.

37.   In light of the Licensor's average cash-based sales of approximately $35,000 for all of its Channel Reports from all of its customers over the relevant 10-month period,  Monster Content's suggestion that it incurred damages over $1.3 million from only one of its

1    customers (Homes) for only one of its Channel products (Schools Lite) is not only

2    speculative, but borders on frivolous.

3    38.    The evidence shows that Homes contracted with another provider to receive similar school-

4    related data in the form of a link for $5,000 per year.  The Court finds this to represent the

5    fair market value of the Schools Lite link at the time that the Agreement was signed.  If the

6    Court were to find that Monster Content incurred damages, they would be in the amount of

7    approximately $5,000.

8                                        CONCLUSION

9           For the reasons stated above, the Court finds that plaintiff Monster Content shall take

10   nothing, that the complaint is dismissed, and that judgment shall be entered in favor of the

11   defendant, Homes.

12

13   **IT IS SO ORDERED.**
     Dated: June 28, 2005

14                                                          /s/

15                                        _____
                                          FERN M. SMITH
                                          UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

21